FILED

06/17/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0144

DA 24-0144

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 125

DANIEL KNUDSEN, ROSE E. AYERS,
ERIC DENNISON, LANCE FRENCH,
ERIK FARNHAM, and KAILA JACOBSON
as Class Representatives,

     Plaintiffs and Appellants,

  v.

THE UNIVERSITY OF MONTANA, a unit
of the Montana University System,

     Defendant and Appellee.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV 16-977
Honorable Shane A. Vannatta, Presiding Judge

COUNSEL OF RECORD:

    For Appellants:

        Nicole L. Siefert, Siefert & Wagner, PLLC, Missoula, Montana

        John L. Amsden, Justin Stalpes, Conner Bottomly, Sydney Best, Beck
Amsden & Stalpes, PLLC, Bozeman, Montana

    For Appellee:

        Lucy T. France, Office of Legal Counsel, The University of Montana,
Missoula, Montana

        Maxon R. Davis, Davis, Hatley, Haffeman & Tighe, P.C., Great Falls,
Montana

Submitted on Briefs:  March 26, 2025

Decided:  June 17, 2025

Filed:

_____
Clerk

2

Justice Beth Baker delivered the Opinion of the Court.

¶1 Former students brought class action claims against the University of Montana for its handling of student loan reimbursement payments. Following a Missoula County jury's verdict in the University's favor, Students appeal several of the trial court's rulings. We consider the following restated issues:

*1. Were Students entitled to preclude the University from presenting evidence and argument about Students' careless banking practices?*

*2. Did the University's expert impermissibly testify to improper legal conclusions?*

*3. Did the University's closing argument prejudice Students' right to a fair trial?*

*4. Are Students entitled to a new trial because the District Court improperly admitted the University's fee comparison chart into evidence?*

*5. Are Students entitled to a new trial because the District Court refused their requested burden-shifting instruction?*

We affirm the District Court's evidentiary rulings and find it unnecessary to address the alleged instructional error.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 When a university receives student loan funds from the federal government on behalf of a student, the school credits the student's account for tuition and fees. It then reimburses students the remaining funds for other expenses such as books, room, and board. Prior to 2010, the University issued student loan reimbursements via paper check. In May 2010, the University contracted with Higher One Holdings, Inc. to provide reimbursement processing services. Higher One was not a bank but a "third-party servicer"—a private entity providing services to university students that the University

otherwise would provide. Because Higher One could not hold money itself, it partnered with a commercial bank to issue student reimbursements.

¶3 From 2010 to 2012, Higher One mailed newly registered students a "UM Refund Choice Card," which allowed students to select a preferred reimbursement method after authenticating the card online. A student could choose to open an account with Higher One's partner bank—called a OneAccount—to receive reimbursement. Higher One then activated the debit card for the student. OneAccounts functioned as bank accounts from which a student could withdraw money via an ATM, use the debit card to make purchases, or overdraw the account by incurring charges exceeding available funds. Students could also reload the debit card connected to their OneAccount. Alternatively, students could choose to have reimbursements sent to their own, separate bank accounts. Students received their reimbursement by paper check if they did not select an electronic reimbursement option.

¶4 Higher One could charge the University and OneAccount cardholders fees as detailed in the contract between the University and Higher One. The student fees included $0.50 for each debit card transaction and additional fees for use of non-Higher One ATMs, for insufficient funds, and for abandoned accounts. Students could access the fee schedule on Higher One's website. The University and Higher One's contract expired in 2015 and was not renewed.

¶5 In 2016, students Daniel Knudsen, Rose Ayers, Eric Dennison, Lance French, Erik Farnham, and Kaila Jacobsen filed a class action complaint against the University seeking damages and injunctive and equitable relief. Students alleged that the University's

4

agreement with Higher One subjected them to excessive bank fees and that the University unlawfully disclosed personal information to Higher One without their consent. The District Court certified three classes in the lawsuit, defined as:

Class 1: Past or present students of Defendant University who paid fees to Higher One Holdings, as a consequence of opening an account with Higher One to receive student loan refunds.

Class 2: Past or present students of Defendant University whose personal information was transmitted to Higher One Holdings.

Class 3: Past or present students of Defendant University whose personal information has been or may be transmitted to a third-party vendor or third-party contractor without prior written consent in circumstances other than where transmission is necessary for completion of a task having a legitimate educational interest.

¶6 The University appealed class certification. We affirmed the District Court in part, upholding its certification of Class 1 and Class 2. *Knudsen v. Univ. of Mont.*, 2019 MT 175, ¶ 25, 396 Mont. 443, 445 P.3d 834 (*Knudsen I*). Regarding Class 1, we held that the class "will include only students who paid allegedly unauthorized fees as a consequence of opening an account with Higher One to receive student loan refunds. Students charged overdraft fees for their own careless banking practices are not encompassed within the class definition." *Knudsen I*, ¶ 20. We reversed the District Court's certification of Class 3. *Knudsen I*, ¶ 16.

¶7 Back in the District Court, the parties filed cross-motions for summary judgment. The District Court ruled in part that the special relationship between the University and Students gave rise to a fiduciary duty. Whether the University breached its fiduciary duty to Students, the court ruled, was a question of fact for the jury to resolve. Students filed

5

several motions in limine, including a motion seeking to prohibit argument that damages resulted from their own careless banking practices. The District Court denied this motion.

¶8 The case proceeded to a seven-day jury trial in January 2024. Through expert testimony, Students argued that the federal standards governing the student loan process obligated the University to act in their best interests during the 2010-2015 contract timeframe. Contracting with Higher One to save money; failing—despite several federal investigations into Higher One's practices—to conduct due diligence or renegotiate the contract to lower student fees; failing to make OneAccount fees transparent to students; encouraging students to open a OneAccount over other reimbursement options; and generally permitting Higher One to charge them unfair or deceptive fees, Students argued, all constituted violations of the University's duty to act in their best interests.

¶9 The University argued that the impetus for contracting with Higher One was not to save itself money, but to expedite the process of issuing reimbursements to students. The University's expert told the jury that—during the lifetime of the contract with Higher One—it was not obligated under federal regulation to act in students' best interests. The University contended that it did not violate its federal regulatory obligations to Students and did not breach any fiduciary duty.

¶10 The jury returned a verdict finding that the University did not breach its fiduciary duty to Students; that the University did not violate Students' statutory or constitutional rights to privacy through its contract with Higher One; and that the University was not unjustly enriched through expense savings. Students appeal the jury's verdict only on their fiduciary duty claim.

6

**STANDARDS OF REVIEW**

¶11 We review each of the District Court's challenged rulings on appeal for abuse of discretion. *See TCF Enters., Inc. v. Rames, Inc.*, 2024 MT 38, ¶¶ 15-16, 415 Mont. 306, 544 P.3d 206 (citations omitted) (admissibility of evidence and instructions to the jury); *State v. Edwards*, 2011 MT 210, ¶ 12, 361 Mont. 478, 260 P.3d 396 (citation omitted) (rulings on motion in limine). A trial court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in a substantial injustice. *TCF Enters., Inc.*, ¶ 15 (citations omitted).

¶12 An erroneous jury instruction does not constitute reversible error unless a party's substantial rights are prejudicially affected. *State v. Kaarma*, 2017 MT 24, ¶ 7, 386 Mont. 243, 390 P.3d 609 (citation omitted).

**DISCUSSION**

¶13 *1. Were Students entitled to preclude the University from presenting evidence and argument about Students' careless banking practices?*

¶14 When it denied Students' motion in limine, the District Court looked to *Knudsen I*, in which we stated that "[s]tudents charged overdraft fees for their own careless banking practices are not encompassed within the class definition." *Knudsen I*, ¶ 20. The District Court concluded that the University could introduce evidence and argument about students' incurrence of overdraft fees due to their careless banking practices because these students were not class members. The court also permitted the University to introduce evidence and argument about banking fees generally, reasoning that it was "necessary for the parties to present evidence as to whether students paid unauthorized fees as a consequence of

7

opening an account with Higher One to receive student loan refunds." The jury would have to resolve "whether the fees are banking fees, excessive, or a result of careless banking practices." The court allowed evidence regarding whether Higher One or its partner bank was charging fees, pursuant to what authority or agreement, and the nature of the fees.

¶15 Students argue that the District Court's pretrial ruling allowed the University to impermissibly assert a comparative negligence defense. Quoting *Bear Medicine v. U.S.*, 192 F. Supp. 2d 1053, 1068-69 (D. Mont. 2002), Students contend that "it is consistent with existing Montana law to find that the defense of comparative negligence is unavailable in a claim for breach of fiduciary duty." Students also assert that because Higher One undisputedly was not a bank, the University could not argue or present evidence that Higher One's fees were banking fees. Whether certain fees were excessive and authorized, the University responds, were disputed factual questions and therefore "it was appropriate to allow both parties to put on evidence of what fees were authorized and what fees were unauthorized."

¶16 We interpreted the District Court's class definition in *Knudsen I* to "include only students who paid allegedly unauthorized fees as a consequence of opening an account with Higher One to receive student loan refunds" but to exclude those whose careless banking practices caused their losses. *Knudsen I*, ¶ 20. The District Court used conscientious judgment when it relied on this articulation of the class definition to rule on Students' motion in limine. A student who used Higher One services beyond simply to receive refunds and incurred additional fees associated with their own actions—such as overdraft charges—would be excluded from the class definition. The District Court

8

appropriately allowed the University to present evidence and argument on any such practices. Likewise, presentation of evidence and argument about banking fees was necessary to explain which entity charged certain fees and to assist the jury in deciding whether the fees were authorized. The District Court did not abuse its discretion in denying Students' motion in limine. *See TCF Enters., Inc.*, ¶ 15 (citation omitted).

¶17 *2. Did the University's expert impermissibly testify to improper legal conclusions?*

¶18 Students requested that the court prohibit the University's expert witness, Dennis Cariello, from testifying about the University's compliance with federal regulations. Before Cariello testified, the court orally ruled

> [G]iven that the ultimate issue is did the University of Montana breach its fiduciary duties, which is beyond mere satisfaction of the . . . rules and regulations that, in some regard, the statute and regulations provide a form of standard of care that the University has to meet.

> So, . . . it's appropriate that Mr. Cariello can opine that the University of Montana has met its responsibilities. But I am going to caution the defendant that it ought not be some huge opinion about meeting all of the requirements.

The court further ruled that

> the University following the regulations is setting a form of standard of care. And, so, much like any other standard of care witness, this expert may go ahead and talk about how requirements were met. Again, . . . the University . . . and Mr. Cariello ought to be very cautious[] about discussing his interpretation of the law, and focus on . . . specific facts of how the University met specific requirements that may be outlined by the law.

¶19 As an attorney in private practice, Cariello has spent his career helping universities and higher education service providers comply with applicable federal regulations. Cariello explained that the Department of Education issued new regulations in 2007 that were applicable to universities from 2008 to 2016. These 2007 regulations, Cariello said,

9

were in effect during the lifetime of the 2010-2015 contract between the University and Higher One. Cariello opined that the most important requirement of the 2007 regulations was that there had to be convenient access to an ATM on or adjacent to campus. The 2007 regulations also required that once a university disbursed student funds to a third-party service provider, the university could not pursue those funds, if, for example, the student owed money for a parking ticket. Cariello testified that the Department of Education issued new regulations in 2016 that obligated universities—for the first time—to negotiate for third-party service provider contracts with students' best interests in mind.

¶20 The federal government requires that universities conduct an annual compliance audit to ensure they are complying with federal regulations. Cariello reviewed the University's compliance audits during the period it contracted with Higher One and found "[n]othing . . . no mention of any infractions related to this service, or the timeliness, or other disbursement history related to the relationship with Higher One." Cariello also opined that, under federal regulation and regulatory guidance, the University's co-branding of the Refund Choice Card was an allowable practice at the time. Higher One's practice of encouraging students to open a OneAccount to get their refund faster, Cariello said, was a permissible practice during the University's contractual relationship with Higher One. Although Higher One was subject to two FDIC investigations between 2010 and 2015, Cariello testified that it did not appear from the resulting consent decrees that Higher One's relationship with the University of Montana was at issue.

¶21 Cariello concluded that "the relationship with the University . . . and Higher One materially met the standards of conduct in the industry at the time." Cariello similarly

10

opined that the University's contract with Higher One materially complied with the industry standards for contracting with third-party servicers to disburse student credit balances when the University entered the agreement in 2010. On redirect examination, Cariello stated that

> [t]he obligation that universities have, first and foremost in this process, is to receive that money from the Federal Government and apply it in the manner as dictated by the Federal Government. They are the ones that set the terms of this. And as long as the university fulfills that obligation, it has met its fiduciary duty.

Students objected, and the court held a sidebar discussion with counsel out of the jury's hearing. After the discussion, which was not put on the record, the District Court permitted the University's counsel to continue examining Cariello consistent with the sidebar discussion. Defense counsel returned to specific questions about the University's federal regulatory obligations and the nature of Higher One's debit card issued to students. Cariello did not again offer an opinion that the University met its fiduciary duty to Students.

¶22    Students argue that Cariello violated the District Court's ruling prohibiting him from making broad statements about the law. Students specifically point to Cariello's statement—to which the court sustained their objection—that "so long as the university fulfills that obligation [to the federal government], it has met its fiduciary duty." Students also assert that Cariello's testimony contradicted the law of the case. Cariello testified that the 2016 federal regulations obligated universities for the first time to keep students' best interests in mind when negotiating with third-party servicers. Students contend this testimony contradicted the District Court's conclusion that the special relationship between the University and Students gave rise to a fiduciary duty.

11

¶23     The University argues that Cariello did not offer improper legal conclusions.  The University cites a series of cases drawing the distinction between proper expert testimony to an ultimate issue of fact and improper legal conclusion testimony.  *Compare Heltborg v. Mod. Mach.*, 244 Mont. 24, 32-33, 795 P.2d 954, 958-59 (1990) (expert testimony that employer was negligent in terminating employee; that reduction in workforce was negligent; and that breach of obligations caused employee's loss of benefits were legal conclusions requiring new trial), *and Citizens for a Better Flathead v. Bd. of Cnty. Comm'rs*, 2016 MT 256, ¶¶ 16-18, 385 Mont. 156, 381 P.3d 555 (no abuse of discretion in striking expert report that applied law to county's growth policy revision process), *with Mickelson v. Mont. Rail Link, Inc.*, 2000 MT 111, ¶¶ 100-03, 299 Mont. 348, 999 P.2d 985 (expert testimony covering a train crew's obligations as they approach a crossing did not state improper legal conclusions), *and Mahan v. Farmers Union Cent. Exch., Inc.*, 235 Mont. 410, 421-22, 768 P.2d 850, 857 (1989) (experts could testify that statistics showed patterns of age discrimination, but not that age discrimination was or was not exercised against plaintiff).

¶24     Like the expert testimony in *Commissioner of Political Practices v. Wittich*, 2017 MT 210, ¶ 45, 388 Mont. 347, 400 P.3d 735, the University argues, Cariello's testimony helped the jury understand the complex regime of federal rules and regulations governing universities' obligations when reimbursing students.  The University highlights the District Court's comment that "the ultimate issue is did the University . . . breach its fiduciary duties, which is beyond mere satisfaction of the . . . rules and regulations that, in some regard, the statute and regulations provide a form of standard of care that the

12

University has to meet." Cariello, the University contends, testified to the University's compliance with the federal regulatory scheme, but not to the ultimate issue of law in the case—whether the University breached its fiduciary duty to Students.

¶25 M. R. Evid. 704 provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." "District courts 'are vested with great latitude in ruling on the admissibility of expert testimony.'" *Wittich*, ¶ 38 (quoting *Cartwright v. Scheels All Sports, Inc.*, 2013 MT 158, ¶ 37, 370 Mont. 369, 310 P.3d 1080). "[A]lthough an expert may not state a legal conclusion or apply the law to the facts in an answer, an expert may properly testify to an ultimate issue of fact." *Mickelson*, ¶ 101. An expert witness may not testify to "ultimate issues of law because legal conclusions offered by an expert witness invade the province of the jury." *Wittich*, ¶ 38 (quoting *Perdue v. Gagnon Farms, Inc.*, 2003 MT 47, ¶ 28, 314 Mont. 303, 65 P.3d 570).

¶26 In *Wittich*, the Commissioner of Political Practices filed a complaint against a state senator, alleging that he violated Montana's campaign finance laws when he failed to report campaign contributions and coordination with certain entities. *Wittich*, ¶¶ 4-7. The district court allowed the Commissioner to testify as an expert witness at trial. *Wittich*, ¶ 10. The jury issued a verdict in favor of the Commissioner, concluding that Wittich violated state campaign finance laws. *Wittich*, ¶ 12. Wittich argued on appeal that the Commissioner's testimony included improper legal conclusions, constituting reversible error. *Wittich*, ¶ 36.

¶27 We noted that "[i]ssues of fact and law do not neatly divide in a case brought to assess compliance with campaign finance laws" and acknowledged that the

13

Commissioner's answers "embraced the overlapping ultimate issues of fact and issues of law." *Wittich*, ¶ 43. We held that "[a]lthough Commissioner Motl offered some legal conclusions, the majority of his testimony assisted the jury in 'determin[ing] a fact in issue,' M. R. Evid. 702, by providing 'actual, objective evidence showing coordination between' the entities and Wittich." *Wittich*, ¶ 45. After viewing the Commissioner's testimony in its entirety and concluding that it was "dominated by hard factual evidence of coordination between Wittich and the entities at issue," we concluded that any error did not prejudice the outcome and that the trial court did not abuse its discretion in admitting the Commissioner's testimony. *Wittich*, ¶¶ 44, 47.

¶28 In like manner, Cariello's testimony in its entirety shows that he explained the complex and evolving federal regulations applicable to universities between the early 2000s and 2016; provided accessible definitions for the jury to understand the concepts of "credit balance" and "third-party servicer"; and grounded his broader opinions about the University's compliance with federal regulations in specific factual evidence. For example, Cariello said he saw no issues related to Higher One in the University's compliance audits and opined that, at the time, the Department of Education allowed the University both to co-brand the "Choice Refund Card" and to encourage students to open a OneAccount. He also testified that the consent decrees resulting from the FDIC investigations into Higher One did not relate to Higher One's contract with the University. Like the permissible testimony of many standard of care witnesses, Cariello then concluded that "the relationship with the University . . . and Higher One materially met the standards of conduct in the industry at the time." *See Howlett v. Chiropractic Ctr., P.C.*, 2020 MT 74,

14

¶ 18, 399 Mont. 401, 460 P.3d 942 (expert testimony necessary in medical malpractice action to establish applicable standard of care) (citations omitted); *Young v. ERA Advantage Realty*, 2022 MT 138, ¶ 29, 409 Mont. 234, 513 P.3d 505 ("[A] professional negligence claim generally requires expert testimony to establish breach of the applicable standard of care . . . .") (citation omitted).

¶29 Students conflate Cariello's testimony—that the University met the standard of care at the time, as dictated by federal regulation—with the ultimate issue in the case. As the District Court explained, however, the ultimate issue was whether the University breached its fiduciary duty to Students, "which is beyond mere satisfaction of the rules and regulations" that set the standard of care. Students are correct that in one instance, Cariello invaded the province of the jury when he stated that the University met its fiduciary duty so long as it fulfilled its obligation to the federal government. The District Court, however, sustained Students' objection, the parties had an off-the-record discussion with the court, and Cariello did not make a similar statement again. The record does not show that Students' counsel asked the court to strike his answer or to give any curative instruction.

¶30 Like Cariello, Students' expert, Doug Brown, offered testimony about the standard of care applicable to the University. He opined that the University violated this standard when it entered into the contract with Higher One. Brown is a former CEO of various banks and a member of the boards of regents for the University of Arizona and the University of New Mexico. He also served as State Treasurer for New Mexico and Dean of the University of New Mexico business school. Brown testified that he was familiar with the requirements—as dictated by federal law and regulation—that universities must

15

follow when issuing student loan reimbursements. Brown testified that during the same time period as the University's contract with Higher One, the Department of Education imposed a fiduciary duty on universities to act in students' best interests and to ensure that third-party servicers did the same. This fiduciary duty, Brown testified, came from the Higher Education Act, federal regulations, and through "Dear Colleague letters" the Department of Education sent to university presidents. Brown explained that the Department of Education issues "Dear Colleague" letters as "periodic bulletins reinforcing important points of . . . conduct" for universities. He characterized the guidance from the Department of Education as "like the 11 commandments of the university to operate properly with respect to third-party servicers."

¶31    Brown opined that the University's Higher One contract created a financial conflict of interest with students and violated its fiduciary duty to act in their best interests. Brown further testified that the University's promotion of Higher One's OneAccount over other services violated the University's duty to act in students' best interests. Brown agreed that "the standard of care applicable to universities across the country require[d] refraining from entering into business arrangements with third-party servicers that are disadvantageous to students[.]" Although Brown framed his opinions in different terminology, like Cariello he offered permissible testimony on the University's actions in light of the applicable standard of care.

¶32    The District Court's instructions to the jury further indicate that Cariello's standard of care testimony did not go to an ultimate issue of law. The District Court defined the fiduciary relationship between Higher One and the University, outlined what would

16

constitute a breach of this duty, and explained that the University was obligated to follow all state and federal law and regulations:

INSTRUCTION NO. 13

The University of Montana is required by the Department of Education to disburse student financial aid funds pursuant to Title IV of the Higher Education Act. When a student receives Title IV funds, the University first applies the funds to expenses charged by the University, such as tuition and fees. After those funds are applied to the student's account with the University, the amount left over is called a "credit balance." Both the University and its agents must follow all state and . . . federal laws and regulations in place at the time of disbursement of the credit balances to students.

INSTRUCTION NO. 16

[A] fiduciary relationship arises when one party has a high degree of control over the property or subject matter of another, when the party has a condition of superiority over another, or when the other party places a high level of trust and confidence in the fiduciary to look out for the best interests of another.

In this case, the Court has determined that the University of Montana owed a special duty to Plaintiffs known as a "fiduciary duty." This means that the University of Montana was a "fiduciary" with respect to Plaintiffs. This relationship was based on the fact that UM is responsible for processing student loan refunds (money not its own but for the benefit of Plaintiffs), that Plaintiffs were not a party to the contract with Higher One Holdings, and that Plaintiffs had little if any choice but to continue placing their trust in UM to implement a process for disbursing their credit balances in a manner that would not cause them to suffer loss or injury by reason of its negligence.

The fiduciary duty in this case means that the University of Montana owed Plaintiffs a duty to act with the utmost good faith in the best interests of Plaintiffs when it came to the student loan refund process.

INSTRUCTION NO. 19

You must decide whether the University of Montana breached its fiduciary duty to Plaintiffs.

The University of Montana breached its fiduciary duty if you find that it failed to act in the best interests of Plaintiffs or acted in a manner which would result in harm or loss to Plaintiffs.

Plaintiffs have the burden to prove that the University: (1) breached its fiduciary duty it owed to Plaintiffs; (2) that such breach was the cause of damages to Plaintiffs; and (3) that Plaintiffs suffered damages.

17

To decide this question, you should consider: [w]hether University of Montana took reasonable steps to act in Plaintiffs' best interests with regard to the student loan refund process by contracting with and continuing to work with Higher One Holdings; [and] [w]hether the University of Montana endorsed services provided by Higher One, or whether it provided only general information regarding the Higher One Holdings refund disbursement process.

Aside from instructing the jury that the University was obligated to follow state and federal law, the court did not give specific instruction on the federal laws and regulations establishing the standard of care or tell the jury that its job was to determine whether the University complied with such laws and regulations. Rather, the jury was tasked to determine whether the University failed to act in Students' best interests in administering the student loan refund process.

¶33    "A party's substantial right 'is not affected unless the challenged evidence is of such character to have affected the result of the case.'" *Wittich*, ¶ 45 (quoting *In re Estate of Edwards*, 2017 MT 93, ¶ 50, 387 Mont. 274, 393 P.3d 639). On the whole, both Brown and Cariello addressed the third-party servicer arrangement, the standards put in place by the federal government, and how those standards governed the relationship between the University and Higher One. This testimony approached the territory of legal conclusions, but it also helped to explain a complex process to the jury and to develop the parties' theories of whether the University met its fiduciary obligations. *See Wittich*, ¶¶ 43, 47 ("Commissioner Motl's often narrative answers embraced the overlapping ultimate issues of fact and issues of law, notwithstanding his phrasing of his opinions as on 'matters of fact.'"). The District Court did not act "arbitrarily without employment of conscientious judgment or so exceed[] the bounds of reason as to work a substantial injustice" when it

18

admitted Cariello's testimony. *TCF Enters., Inc.*, ¶ 15 (quotation omitted). When Cariello did offer an opinion directly addressing compliance with fiduciary duty, Students objected, and the District Court sustained the objection. Cariello's single legal conclusion within extensive, proper factual testimony is unlikely to have affected the result of the case and caused Students prejudice. *See Wittich*, ¶ 45 (quotation omitted). Students have not shown reversible error in the admission of Cariello's testimony.

¶34    *3. Did the University's closing argument prejudice Students' right to a fair trial?*

¶35    Students contend that the University put an excluded matter before the jury in closing argument, causing them prejudice and requiring reversal. Defense counsel said several times that Cariello's testimony showed there was "nothing illegal" about the University's relationship with Higher One. The District Court sustained Students' objection to defense counsel's statement that "there was no violation of any State or Federal law in the University's arrangements or contract with Higher One." Citing *Workman v. McIntyre Construction Co.*, 190 Mont. 5, 617 P.2d 1281 (1980), Students maintain that these closing arguments put "evidence, argument[,] or suggestion of an excluded matter before the jury in contravention of [the] District Court's ruling."

¶36    "We consider alleged improper statements during closing argument in the context of the entire argument." *Anderson v. BNSF Ry.*, 2015 MT 240, ¶ 75, 380 Mont. 319, 354 P.3d 1248 (citation omitted). "Improper argument requires reversal only when prejudice has resulted which prevented a fair trial." *Harne v. Deadmond*, 1998 MT 22, ¶ 5, 287 Mont. 255, 954 P.2d 732.

19

¶37 In *Anderson*, ¶ 74, the District Court granted pretrial motions in limine prohibiting BNSF from "making improper personalization, opinion, or commentary on [the Plaintiff] and his attorneys and to prevent making arguments likely to inflame the jury by stating that lawsuits should not improve a plaintiff's standard of living or make him a millionaire." We reversed after BNSF's counsel during closing argument repeatedly insinuated that there was a conspiracy by union attorneys to bring bogus claims against the railway company; questioned whether lawsuits should be about making people wealthy at a corporation's expense; "made repeated references to collateral sources, such as retirement benefits railroad employees receive[;] and accused [the plaintiff] of trying to 'double dip' by pursuing damages for lost fringe benefits." *Anderson*, ¶¶ 74-76.

¶38 We also reversed for improper closing arguments in *Harne*. Plaintiffs sued Deadmond for negligent construction of their home, alleging among other claims that Deadmond was liable for violating the Montana Consumer Protection Act (MCPA). *Harne*, ¶ 2. During closing argument, Deadmond's attorney discussed his three terms as a state representative, then described the MCPA as "a law passed by the Montana legislature to get the scammers and swindlers who are preying upon Montana consumers," and said that he would hate to see it "on [Deadmond's] record, that he was convicted of scamming consumers." *Harne*, ¶¶ 6-8. This was a misstatement of the law, as a plaintiff may seek civil relief—not a criminal conviction—through the MCPA. *Harne*, ¶ 8. Deadmond's attorney also vouched for the credibility of his client during closing argument, in violation of an attorney's obligation in trial not to "assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, [or]

20

the credibility of a witness." *Harne*, ¶ 9 (quoting M. R. Pro. Cond. 3.4(e)). We held that in the absence of a curative instruction from the trial court, it was prejudicial for counsel to improperly testify to his favorable personal experience with Deadmond. *Harne*, ¶ 11; *see also Workman*, 190 Mont. at 12-13, 617 P.2d at 1285-86 (reversing defense verdict in trial for wrongful death of plaintiff's wife because counsel violated order in limine when he referred to plaintiff's remarriage).

¶39 The University's closing argument is distinguishable from improper arguments that have warranted reversal. Unlike *Anderson*, ¶ 79, where "BNSF's attorneys consistently violated the . . . orders in limine," the District Court's order in limine here did not prohibit the University from arguing that it complied with state and federal law or that it did "nothing illegal." Likewise, the University did not introduce a prohibited fact into evidence in violation of an order in limine. *Cf. Workman*, 190 Mont. at 12-13, 617 P.2d at 1285. Nor did the University's counsel misstate the law and rely on personal experience in testifying to a party's credibility, like the improper argument in *Harne*, ¶¶ 8-9. The University's argument that it did nothing illegal was not a clear violation of the District Court's order in limine.

¶40 The University defended against the class claims by arguing that its contract with Higher One, and its conduct under that contract, were appropriate. Counsel's argument that the University acted in accordance with governing standards was not improper. As class counsel pointed out in his closing, however, the University also was required—as a fiduciary—to act in the students' best interests. The court instructed the jury that the University had "a duty to act with the utmost good faith in the best interests of Plaintiffs."

21

Defense counsel addressed this by arguing that the fiduciary duty "began and ended . . . with the student loan refund process" and did not extend to a student's banking relationship with Higher One or its partner bank. This did not exceed the permissible bounds of closing argument. Students have not carried their burden on appeal to show prejudice preventing a fair trial.

¶41    *4. Are Students entitled to a new trial because the District Court improperly admitted the University's fee comparison chart into evidence?*

¶42    Bob Hlynosky, the University's Procurement and Accounts Payable Director, testified for the University. On direct examination, counsel asked Hlynosky whether, prior to contracting with Higher One, the University undertook due diligence efforts to determine whether Higher One's reimbursement regime was reasonable. Hlynosky responded that he researched Higher One's fees and prepared a chart that compared Higher One's fees with the fees charged by certain banks. Students objected to the University's attempt to introduce Hlynosky's fee comparison chart into evidence, arguing that it was hearsay. The District Court overruled the objection and admitted the fee comparison chart.

¶43    Students argue Hlynosky's fee comparison chart should have been excluded and that its admission prejudiced their substantial rights. The District Court, Students note, admitted the chart only because Hlynosky made it. Students contend that this rationale misapplied M. R. Evid. 801(d)(1) because the chart was inadmissible as a prior consistent statement. As they did not charge Hlynosky with subsequent fabrication or improper influence or motive, the document was hearsay and improperly bolstered the witness's testimony. Students also argue that the court should not have sent the chart back with the

22

jury for deliberation, violating "the common law rule against submission of testimonial materials to the jury for unsupervised and unrestricted review." *State v. Nordholm*, 2019 MT 165, ¶ 10, 396 Mont. 384, 445 P.3d 799 (*quoting State v. Stout*, 2010 MT 137, ¶ 29, 356 Mont. 468, 237 P.3d 37).

¶44 The University responds that the chart was admissible under the business and the public records hearsay exceptions. The University also points to Ann Heser's testimony, arguing that it established the same facts as the chart. Heser, the former financial officer of a Missoula bank, opined that the fees Higher One charged were in line with those of local and regional banks between 2010 and 2015. Admission of the chart, the University contends, was not prejudicial because Heser's testimony confirmed that Higher One's fees were comparable to local and regional banks in that timeframe.

¶45 Students rely on *Nordholm*—a criminal case—for their argument that the common law prohibits submission of testimonial materials to the jury during deliberation. In a civil trial, however, "[u]pon retiring for deliberation, the jurors may take with them all papers which have been received as evidence in the case except depositions or copies of such papers as ought not, in the opinion of the court, to be taken from the person having them in possession." Section 25-7-404, MCA; *see also* § 1-1-108, MCA ("In this state there is no common law in any case where the law is declared by statute."); *accord Kyriss v. State*, 218 Mont. 162, 173-74, 707 P.2d 5, 12 (1985) (no abuse of discretion in medical malpractice action when court allowed plaintiff's highlighted medical records to go to jury during deliberation); *Frederick v. Hale*, 42 Mont. 153, 166-67, 112 P. 70, 75 (1910) (no prejudice to defendant when trial court allowed pleadings to go back to jury during

23

deliberation). Though demonstrative aids are not ordinarily sent to the jury room, there is no suggestion that the chart was prepared or used for that purpose.

¶46 When a trial court admits inadmissible evidence, we will not reverse the verdict "unless the challenged evidence would have affected the result of the case." *Maier v. Wilson*, 2017 MT 316, ¶ 42, 390 Mont. 43, 409 P.3d 878 (citation omitted). The record does not indicate that the chart played a significant role in the University's case. Students do not claim that Hlynosky's testimony about his fee comparisons was improper, only the chart he prepared. The District Court admitted Heser's testimony to the same effect without objection. And the University did not mention the comparison of Higher One's fees in closing argument. "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ." M. R. Evid. 103(a). Viewing the record as a whole, we conclude that admission of Hlynosky's chart, even if error, did not affect Students' substantial rights, as they have not demonstrated that the chart "affected the result of the case." *Maier*, ¶ 42.

¶47 *5. Are Students entitled to a new trial because the District Court refused their requested burden-shifting instruction?*

¶48 Students' final argument is that the District Court improperly refused to instruct the jury that "when a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach." Restatement (Third) of Trusts § 100 cmt. f (Am. L. Inst. 2012). This instruction related to Students' claims for damages if the jury found the University liable. The jury found that the University did not

24

breach its fiduciary duty to Students, violate their privacy rights, or that it was unjustly enriched. Because the jury found that the University was not liable to Students, it never considered the issue of damages. Any pretrial error in the related instructions was therefore harmless, and we decline to consider the issue further. *Wenger v. State Farm Ins. Co.*, 2021 MT 37, ¶ 33, 403 Mont. 210, 483 P.3d 480 (declining to consider plaintiff's damages argument where jury found no negligence).

## CONCLUSION

¶49 Students have not demonstrated that the District Court's challenged rulings prejudiced their substantial rights to a fair trial. We affirm the jury's verdict and the District Court's judgment in the University's favor.

/S/ BETH BAKER

We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M BIDEGARAY
/S/ LAURIE McKINNON
/S/ JIM RICE